E-FILED
Tuesday, 20 February, 2018  07:20:06 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| LISA R. WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 16-cv-4025 |
| | ) | |
| DAVID W. JONES, Human Resource and Risk | ) | |
| Management Director for the City of Galesburg, | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendant. | ) | |

## **MOTION FOR SUMMARY JUDGMENT**

Defendant, DAVID W. JONES ("Jones"), Human Resource and Risk Management

Director for the City of Galesburg ("Galesburg") in his individual capacity, by his attorney,

JAMES KELLY LAW FIRM, pursuant to Federal Rule of Civil Procedure 56 and Local Rule

7.1(D)(1), request this Court grant his Motion for Summary Judgment against Plaintiff, LISA R.

WILSON ("Wilson") and in support states:

### **Introduction**

Galesburg has a Handivan curbside transit system for persons with special transit needs.

The Handivan service provides lift-equipped transportation for people with disabilities.  Wilson

worked as a dispatcher for the Handivan department.  Galesburg received federal funding to

operate the Handivan service, which required Galesburg to comply with drug-testing

requirements.  Galesburg hired Jones as the human resource manager.  During his review of

Galesburg's policies to ensure compliance, Jones discovered that Wilson was the only member

of the Handivan department not being drug-tested.  Jones researched the issue and determined

that anyone performing a "safety-sensitive" function like dispatching should be tested.  Because

Wilson performed dispatching, Jones advised Wilson that pursuant to federal regulation she would need to pass an initial drug-test, defined as a pre-employment test, to be added to the testing pool.  Wilson consented to the scheduled test and passed.  Thereafter, her tests were random.  Wilson still works for Galesburg and enjoys her job.  Wilson continues to be drug-tested as a dispatcher today, even though Jones is currently retired.  Wilson now claims her initial test was racially motivated because Wilson believes as a dispatcher she should not have been drug-tested.  Galesburg had a lawful basis to test Wilson, and even if there was a gray area as to whether a dispatcher should be tested, Jones is entitled to immunity.  Summary Judgment should be granted on all issues for Jones.  Jones requests this Court dismiss with prejudice Wilson's remaining 42 U.S.C. §§ 1981 and 1983 claims alleging Jones drug-tested Wilson because she was black based on Wilson's inability to show a constitutional deprivation or because Jones is entitled to qualified immunity.

## Undisputed Material Facts

1. In 2011, Wilson became employed with Galesburg's Handivan department as a Secretary I. *Exhibit A*, Wilson's Deposition Transcript, 6:20-7:1-2, 21:17-20.

2. Wilson's duties included clerical work and dispatching.  Ex. A, 68:18-22, 69:12-20, 74:6-9; *Exhibit B*, Wilson's Note, March 12, 2014.

3. The Handivan department provided curbside transportation for Galesburg residents with special needs.  Ex. A, 7:5-10.

4. Wilson explained that her job involved arranging transportation for "dialysis patients and cancer patients and ladies to go get their hair done, veterans that wouldn't normally be able to use transportation due to a disability."  Ex. A, 7:5-10.

5.  Wilson's dispatching duties required her to call the Handivan driver regarding where and when passengers would be waiting and adjust schedules as needed.  Ex. A, 68:18-22, 69:14-20.

6.  In July 2012, Jones was hired by Galesburg to be the Human Resource and Risk Manager.  [Dkt. 12, p. 4, ¶ 9]; *Exhibit C,* Jones Deposition 9:7-8.

7.  Jones was required to ensure Galesburg was compliant with all federal, state, and local laws and regulations.  Ex. C, 37:8-14.

8.  As the new Human Resource and Risk Manager, Jones audited Galesburg's policies to evaluate Galesburg's compliance with federal and state laws and regulations.  Ex. C, 27:23-28:3.

9.  In September 2013, Galesburg executed the Downstate Public Transportation Operating Assistance (30 ILCS 740/2-1 et seq.) Grant Agreement ("Grant Agreement"), which subjects Galesburg to several state and federal statutes and regulations regarding drug-free workplaces: "If applicable, the Grantee [Galesburg] also agrees to comply with all aspects of the anti-drug and alcohol program outlined in the "Prevention of Alcohol Misuse and Prohibited Drug Use in Transit Operations" regulation 49 CFR Part 655." *Exhibit D,* Galesburg Grant Agreement Item 29, pages 33-34.

10. In order to receive 49 U.S.C. § 5311 funding for transportation employers, Galesburg's Handivan department was required to adhere to the drug-testing provisions of 49 C.F.R. §655.  Ex. D, Item 29, pages 33-34; Ex. E, ¶ 4; Ex. G, ¶¶ 2-4.

11. "Controlling dispatch or movement of a revenue service vehicle" is a safety-sensitive function, which means the employee performing that function is required to take a drug-test and submit to random drug-tests.  2013 49 C.F.R. §§ 655.4, 655.41; Ex. G, ¶¶ 7-8.

12. If an employer transfers an employee into a job where the employee has a safety-sensitive function, then the employee must pass a drug-test and be placed in a drug-testing pool.  2013 49 C.F.R. § 655.41(b); Ex. C, 25:24-26:3.

13. Jones researched which employees must be drug-tested pursuant to the Grant Agreement, and determined Wilson was the only employee in the Handivan department not being tested.  Ex. C, 24:3-16.

14. Because Wilson's job duties involved dispatching, Jones was concerned with why Wilson was not being tested.  Ex. C, 28:4-19.

15. Todd Thompson, Galesburg's City Manager, discussed with Jones whether Wilson should be drug-tested under the FTA requirements, and Thompson told Jones to research the issue.  *Exhibit H*, Todd Thompson Deposition, 31:12-32:14.

16. As part of his compliance research, Jones discussed Wilson's dispatching role with Jennifer Grider of Mid-West Truckers Association, Inc. ("Mid-West Truckers"), and whether Wilson should be in the Handivan drug-testing pool.  *Exhibit F*, Email from Jones to Grider.

17. Grider, a Coordinator in the Drug & Alcohol Testing Department at Mid-West Truckers, maintained the list of Galesburg employees in the Handivan drug-testing pool in February of 2014.  Ex. F.

18. Galesburg had a contract with Mid-West Truckers to perform Galesburg's drug-testing for Handivan employees.  *Exhibit E*, Candace Wendt Affidavit, ¶ 3.

19. Mid-West Truckers determined the timing of the random drug-tests and performed the drug-testing – not Jones.  Ex. E, ¶ 3.

20. Currently, of the 33 transportation employers for which Mid-West Truckers administers drug and alcohol programs, 25 of those employers specifically include "dispatchers" as part of

4

their drug-testing pool pursuant to 49 C.F.R. § 655, so Galesburg adding Wilson is consistent with almost all other transportation employers.  Ex. E, ¶¶ 2, 7.

21. Jones also inquired with Jeffery Waxman of the Illinois Department of Transportation, who is responsible for ensuring grantees like Galesburg are in compliance with federal law. *Exhibit G*, Jeffery Waxman Affidavit, ¶ ¶ 1-3, 12.

22. Jones specifically asked Waxman if a Secretary I who dispatches the Handivan is performing "safety-sensitive functions" under 49 C.F.R. § 655.  Ex. G, ¶ 13.

23. Waxman told Jones that it was "better to be safe than sorry" regarding complying with drug-testing a Secretary I dispatcher at Galesburg.  Ex. G, ¶ 14.

24. Based on his research, and consulting with numerous people, Jones determined Wilson needed to be in the drug-testing pool based on Federal Transit Administration regulations because Wilson performed a safety-sensitive function when she dispatched a revenue generating vehicle like the Handivan.  Ex. C, 37:2-7, 38:3-7; 2013 49 C.F.R. §§ 655.4, 655.41; Ex. C, 74:16-75:3.

25. During the week of February 17, 2014, Jones personally discussed with Wilson her job duties, and Wilson confirmed dispatch work was part of her job. Ex. A, 71:21-72:9, 75:6-9.

26. According to Wilson, Jones specifically explained that he was asking about her duties as a dispatcher because of the transit policy.  Ex. A, 74:10-15.

27. According to Wilson, the conversation with Jones was cordial and professional.  Ex. A, 77:1-6.

28. According to Wilson, Jones did not make any racial comments of any kind during their conversation.  Ex. A, 76:19-23.

29. Once Jones determined Wilson was going to be in the drug-testing pool, Wilson had to have a scheduled test, as an employee who performs a safety-sensitive function must undergo pre-employment/transfer drug-testing.  49 C.F.R. §§ 655.41, 655.44, 655.45; Ex. G, ¶ ¶ 7, 10.

30. Jones informed Wilson that she was going to be made part of a drug-testing pool due to her dispatch duty.  Ex. A, 74:6-15.

31. Jones personally talked to Wilson to make sure Wilson did not have an issue with being drug-tested.  Ex. C, 25:5-7.

32. Wilson told Jones she did not have a problem with being drug-tested.  Ex. A, 74:22-75:1, 79:8-10; Ex. C, 25:22-24.

33. At the time of Wilson's discussion with Jones about the drug-test, Wilson did not believe the drug-test was racially motivated.  Ex. A, 78:19-79:3.

34. Galesburg added Wilson to the drug-testing pool as a Handivan dispatcher on February 25, 2014 in order to ensure compliance and receive funding.  Ex. E, ¶ 8.

35. The initial pre-employment drug-test was scheduled when Wilson was added to the drug-testing pool.  Ex. C, 25:22-26:3.

36. Thereafter, Wilson was subject to random drug-tests.  Ex. C, 25:22-26:3.

37. Wilson passed the scheduled pre-employment test.  Ex. C, 46:7-18.

38. Thinking Allyson Andrews was Wilson, Jones informed Andrews that she had passed the drug-test.  Ex. C, 46:7-18.

39. Wilson has never had an issue with the February 2014 drug-test or other people finding out the result was negative.  Ex. A, 98:19-21, 133:5-10.

40. Galesburg's only employees that are mandated to be drug-tested absent reasonable suspicion are CDL drivers and transit-related employees.  Ex. H, 53:8-12; Ex. C, 73:4-7.

41. Galesburg does not have any Secretary I dispatchers in the Street department or in the Park District that are required to be tested based on the FTA regulations that require Wilson's drug-testing.  Ex. H, 52:8-17.

42. E911 dispatchers are not required to be drug-tested unless there is reasonable suspicion and E911 dispatchers also do not fall under the FTA's purview.  Ex. H, 51:11-52:7, 52:18-53:5; Ex. C, 74:3-15.

43. Therefore, no other Secretary I at Galesburg dispatches revenue service vehicles, so Wilson cannot be compared to other Secretary Is employed in other departments at Galesburg. Ex. C, 79:17-80:4.

44. Janet Lytle stated that Jones said to Lytle "Well, don't you think she should be tested? She's black." *Exhibit I*, Janet Lytle Deposition, 15:18-16:2.

45. Lytle cannot remember when Jones allegedly said that to her.  Ex. I, 15:9-12.

46. Lytle never documented Jones making that comment.  Ex. I, 15:13-17.

47. Lytle and Wilson are friends.  Ex. I, 54:17-55:8.

48. Lytle filed a sexual harassment claim against Jones in the summer of 2016.  Ex. I, 80:18-81:5.

49. Lytle believes the first time she told someone else about Jones' alleged comment saying Wilson should be drug-tested because she is black is when Lytle told Wilson's attorney, Donald Jackson, in 2017.  Ex. I, 37:17-38:1; 58:5-10.

50. Lytle also stated that Jones, not in Wilson's presence, quoted a Cabinet member from the 1970s who made a racist statement about black people.  Ex. I, 2-14.

51. Lytle also noted that Jones, not in Wilson's presence, quoted a comment he had made in a previous job: "I like my coffee like I like my women, black and bitter."  Ex. I, 35:4-12.

52. Allyson Andrews recalled an incident where Jones "came into the Handivan office to thank Lisa Wilson for the ice cream bars[.]  I let him know that Lisa Wilson didn't bring them in, Lisa Watson did.  He said "Oh yea this is the black Lisa right?" and in return he said ["] I have to remember there is a black Lisa here and a white Lisa.["]"  Ex. A, Exhibit 4, Allyson Andrews' Report; Ex. A, 111:18-20.

53. Jones has never made a racially inappropriate comment to Wilson.  Ex. A, 122:5-16, 199:12-14.

54. Wilson's employment terms have <u>not</u> been affected by this litigation or by Jones.  Ex. A, 28:2-22, 33:7-34:16, 64:20-66:2, 80:8-81:1, 199:15-21.

55. Wilson still works for Galesburg in the Handivan department. Ex. A, 7:12-14, 23:8-18.

56. Wilson has applied for other positions at Galesburg after the initial drug-test, and Wilson believes the process was fair.  Ex. A, 28:2-22.

57. Wilson is still being drug-tested while working for Galesburg as a safety-sensitive employee without objection, and Jones is no longer employed by Galesburg.  Ex. A, 22:15-17, 169:14-19.

58. Jones is retired.  Ex. A, 22:15-17.

## <u>Argument</u>

I.     SUMMARY JUDGMENT STANDARD.

Summary judgment shall be granted when the movant shows there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(a).  For a dispute to be *genuine*, the evidence must be such that a "reasonable jury could not return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  For the fact to be *material*, it must relate to a disputed matter that "might affect the

outcome of the suit." *Id.*  Plaintiffs cannot just point to allegations in their pleading to show a disputed issue. *Valance v. Wisel*, 110 F.3d 1269, 1274-76 (7th Cir. 1997).  Plaintiffs must produce evidence to show a disputed issue.  *Id.*  Additionally, the Court "construes all facts and draws all reasonable inferences from the record in favor of the non-moving party."  *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009).

II.    THE DRUG-TEST WAS A REASONABLE FOURTH AMENDMENT SEARCH: (A) WILSON CONSENTED TO THE DRUG-TEST AND (B) FTA REGULATIONS REQUIRED DRUG-TESTING FOR AN EMPLOYEE PERFORMING A SAFETY-SENSITIVE FUNCTION.

A. *Wilson Consented to the Drug-test, So There Was No Deprivation of Wilson's Constitutional Rights*

Wilson claims Jones violated her constitutional rights by having her drug-tested in February 2014.  However, it is undisputed that Wilson consented to the drug test before it ever occurred and, even now, admits she has no issue with being drug tested.  Wilson's consent is a waiver of her constitutional claims.

Urinalysis drug testing is a search within the meaning of the Fourth Amendment. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989).  The Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. *Id.* at 619.  It is well established that a search is reasonable when the subject consents, and that sometimes consent to a search need not be express, but may be fairly inferred from context.  *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2185 (2016).

In the present case, Wilson consented to the drug test.  Wilson contemporaneously recorded her consent to the drug test, in a March 12, 2014 signed statement, in which Wilson admits "[Jones] again asked me if I was ok with being drug testing (sic).  I responded by telling

him I had no problem with being drug tested." Ex. B, Ex. A, 73:2-19.  Wilson testified she told

Jones, at that time in February 2014, she did not have a problem with being drug tested. Ex. A,

74:22-75:1.  Wilson admitted Jones told her he was asking whether should would be willing to

take the drug test in relationship to Galesburg's transit policy. Ex. A, 75:13-76:8.  Wilson

testified she told Jones that she was willing to take the drug-test, and Wilson freely gave the

drug-test at issue. Ex. A, 79:8-10, 17-19.

       The undisputed fact that Wilson consented to the drug test is dispositive of Wilson's

constitutional claims.  For Wilson to succeed, she must prove Jones adding Wilson to

Galesburg's 49 C.F.R. Part 655 drug testing pool (which required the "pre-employment" drug

test before Wilson could perform "safety-sensitive functions") constituted an unreasonable

search.  However, it is rudimentary Fourth Amendment law that a search which has been

consented to is not unreasonable. *Ferguson v. City of Charleston*, 532 U.S. 67, 93 (2001).  Thus,

Wilson's constitutional claims failed based upon her consent to the drug-test and the Court need

not look any further into Wilson's allegations.

       However, undeterred by her undisputed consent to the search, Wilson alleges a subjective

belief that Jones wanted Wilson tested because she is black.  Wilson's subjective belief that

Jones was motivated by racial animus is irrelevant considering her consent and Jones' lawful

purpose.  Jones had a legitimate purpose for the testing based upon his understanding of 49

C.F.R. Part 655.  Jones' motivation was supported by knowledgeable industry experts.  It is

undisputed that Jones consulted with Mid-West Truckers (who administered Galesburg's 49

C.F.R. Part 655 compliance) and Jeff Waxman (IDOT's manager responsible for rural transit

drug and alcohol compliance) regarding whether Wilson's dispatch position should be included

in the drug testing pool pursuant to 49 C.F.R. 655.  Waxman told Jones that it is "better to be

safe than sorry" on whether to include Wilson's position in the drug testing pool.  Ex. G, ¶ 14.

The inclusion of dispatcher in the drug testing pool under 49 C.F.R. 655 is common in the transit

employers Mid-West Truckers administers.  Ex. E, ¶¶ 2, 7.

Outside of the context of inventory searches or administrative inspections, motive has

never invalidated objectively justifiable behavior under the Fourth Amendment. *Whren v. United*

*States*, 517 U.S. 806, 812 (1996).  Thus, even if Wilson could prove Jones had an ulterior motive

in testing Wilson, which Jones denies, Jones' legally justified request that Wilson be tested

pursuant to 49 C.F.R. Part 655, and Wilson's consent to such search, resulted in a reasonable

search regardless of whatever motivations Wilson now claims Jones' harbored. *Id.* citing *United*

*States* v. *Villamonte-Marquez*, 462 U.S. 579, 584, n. 3 (1983).  The fact that Wilson claims Jones

did not have the state of mind which is hypothecated by the reasons which provide the legal

justification for Jones' action does not invalidate the action taken as long as the circumstances,

viewed objectively, justify that action. *Scott v. United States*, 436 U.S. 128, 138 (1978).

Objectively viewing the circumstances of Jones' legitimate purpose and Wilson's

consent, the drug-testing was reasonable.  Wilson's belated, subjective accusations of nefarious

motives are irrelevant.  There is no question Wilson consented to the drug test and Wilson's

consent made the search reasonable.  There is no question that Jones' legal justification and

Wilson's consent meets the Fourth Amendment's touchstone of objective reasonableness.  As the

drug-test was not a violation of Wilson's constitutional rights, Wilson's claims under Section

1981 and 1983 must fail and the Court need not conduct any further inquiry.  Jones is entitled to

judgment as a matter of law.

B. *Jones' Reliance on Federal Law in Drug Testing Wilson Was a Reasonable Search, Thus There Was No Deprivation of Wilson's Constitutional Rights.*

Although drug testing is a search within the meaning of the Fourth Amendment, and as a general rule requires individual suspicion or wrongdoing to be considered reasonable, suspicionless drug testing is constitutionally permissible when it serves special governmental needs. *Krieg v. Seybold*, 481 F.3d 512, 517 (7th Cir. 2007).   A special need exists when the government employee subjected to the suspicionless drug testing holds a "safety sensitive" position. *Id.* citing *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 630 (1989).

Normally, to determine whether an employee occupies a safety sensitive position, courts must inquire whether the employee's duties were "fraught with such risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences." *Id.*  Courts will next engage in a balancing test between the "intrusion on the individual's Fourth Amendment interests" and the search's "promotion of legitimate governmental interest" considering: 1) the nature of the privacy interest upon which the search intrudes, 2) the character of the intrusion on the individuals' privacy interest, 3) the nature and immediacy of the governmental concern at issue, and 4) the efficacy of the particular means used to address the problem. *Id.* at 518.

However, in this case, there is no need for the Court to engage in the prolonged analysis detailed in *Krieg*.  Congress mandated pre-employment, reasonable suspicion, random, and post-accident testing of mass transportation employees responsible for safety-sensitive functions (as determined by the Secretary) for use, in violation of law or Federal regulation, of alcohol or a controlled substance. DEPARTMENT OF TRANSPORTATION AND RELATED AGENCIES APPROPRIATIONS ACT, 1992, 1991 Enacted H.R. 2942, 102 Enacted H.R. 2942, 105 Stat. 917, 962.  The Federal Transit Authority ("FTA") enacted regulations pursuant to Congress' mandate governing employers that receive financial assistance from the FTA that are designed to

help prevent accidents, injuries, and fatalities resulting from the misuse of alcohol and use of prohibited drugs by employees who perform safety-sensitive functions. 49 C.F.R. § 655.1. Galesburg receives 49 U.S.C.S. § 5311 funding and is required to comply with the FTA's regulatory scheme. 49 U.S.C.S. § 5331, 49 C.F.R. § 655.3.  Pursuant to FTA regulations, Galesburg was required to drug test anyone in its Handivan division before they performed "safety-sensitive functions." 49 C.F.R. § 655.41(a)(1).  "Safety-sensitive function" means controlling dispatch or movement of a revenue service vehicle. 49 C.F.R. § 655.4.  Wilson does not contest that 49 C.F.R. 655 applies to Galesburg's Handivan operations, Wilson only claims she does not perform "safety-sensitive functions."

Galesburg's decision to test Wilson was based on Jones consulting with other knowledgeable people who deal with the application of 49 C.F.R. 655, and Wilson herself. When Jones started working at Galesburg, Jones immediately began auditing Galesburg's compliance with federal and state laws and regulations.  Ex. C, 9:7-8, 27:23-28:3.  In order to continue to receive federal funding from FTA, Jones needed to make sure Galesburg drug-tested safety-sensitive employees. Ex. E, ¶ 4.  Jones consulted with Mid-West Truckers regarding whether Wilson's position should be included in Handivan drug testing pool. Ex. F.  Jones also consulted with Jeff Waxman at the Illinois Department of Transportation regarding whether Wilson's position should be included in the drug testing pool. Ex. G.  Waxman told Jones it is "better to be safe than sorry," indicated Galesburg's Handivan dispatch position should be included in the drug testing pool. Ex. G. Galesburg's City Manager, Todd Thompson, was aware of Jones' concerns.  Ex. H, 31:12-32:14.

Jones also consulted with Wilson, herself, regarding her job duties and Wilson's agreement to be drug tested.  Wilson recorded in her contemporaneous signed statement that she

told Jones her job included clerical work and "dispatch." Ex. B.  Jones discussed with Wilson the context of testing her based on the transit policy, and Wilson consented to a drug test. Ex. A, 71:21-72:9, 74:6-15.

Wilson was drug tested pursuant to 49 C.F.R. § 655.  The FTA requires certified compliance regarding the FTA's drug-testing procedures in 49 C.F.R. § 655.40, *et seq.* from Galesburg as a funding recipient. 49 C.F.R. §§ 655.51, 655.81-655.83.  Wilson admitted that she performed dispatch functions for Galesburg's Handivan division, which operates revenue service vehicles. Ex. A, 74:1-9; Ex. C, 72:1-6.  Jones made a lawful decision, after consulting with multiple sources, including Wilson, to add Galesburg's Handivan dispatcher position to the drug testing pool.

Wilson's disagreement with whether she performs "safety-sensitive functions" is her only contention that the testing, which she is still undergoing even though Jones has retired, was not justified under 49 C.F.R. § 655.  However, Wilson has admitted her job duties include dispatching Handivans, and the FTA regulation describes "safety-sensitive functions" as "controlling dispatch or movement of a revenue service vehicle."  49 C.F.R. § 655.4.  A reasonable interpretation of the federal regulations would include Galesburg's Handivan dispatcher in the drug testing pool.

Jones' purpose in adding Wilson's position to the drug testing pool was to ensure compliance with federal regulations such that Galesburg's federal funding would not be endangered.  Jones was not alone in his interpretation of the applicable regulation.  Twenty-five (25) other transit employers governed by this particular regulation, who were also administered by Mid-West Truckers, included their dispatchers in the drug-testing pool. Ex. E.  As a recipient

of FTA funding, Galesburg's ability to fund transportation related programs, including the Handivan, depended on its compliance with the FTA's drug-testing policies.  Ex. E, ¶ 4.

Jones' interpretation of 49 C.F.R. § 655 is the same conclusion reached by the 9th Circuit on substantially similar facts.  Although it is not precedential and does not bind this Court, the unpublished opinion in *Gonzalez v. Metropolitan Transportation Authority*, 73 F. App'x 986, 989 (9th Cir. 2003) is the only case which dealt with the applicability of 49 C.F.R. § 655.4's definition of "safety-sensitive functions" to dispatchers.  In *Gonzalez*, the Court recited the same standards for safety-sensitive employees which Jones relies on in finding that Gonzalez's work as a bus dispatcher fell within the bounds of the FTA regulatory scheme. *Id.* at 989.  While *Gonzalez* has no controlling impact upon this Court's adjudication, it demonstrates that Jones, a lay person, cannot be considered unreasonable in reaching the same conclusion about the applicability of 49 C.F.R. § 655.4 to a dispatch position as the learned justices on the federal appellate bench.

Wilson's contention that she is not in a safety-sensitive position is self-serving and tenuous.  Wilson continues to be drug tested in her role for Galesburg, even though Jones no longer works for the City.  Thus, in addition to demonstrating her continued consent to the drug testing, Wilson must not find the practice so objectionable or unwarranted as to withdraw her consent.  Additionally, Galesburg, even in the absence of Jones, must still believe Wilson's position is required to be tested under the federal regulations.  In addition to the plain language of the regulation, it also makes sense that a dispatcher, who is exercising cognitive functions in directing the location of Handivans to service disabled passengers, should not be allowed to work while impaired.  In this case, Wilson dispatched the Handivan, which provided transportation for people who are medically unable to use other forms of transportation.  Ex. A,

7:5-10.  Many of the dispatched rides are for disabled passengers to be taken to medical facilities

for appointments, etc.  The Handivan users (who must medically qualify to use the Handivan)

depend on the dispatcher to ensure the users' on-time arrival at medical facilities. Having a

reliable source of transportation empowers the Handivan users to maintain continued medical

treatment, obtain prescriptions and medical equipment, and receive treatment for new medical

issues in a timely fashion.  Providing safe and reliable transportation to people who are medically

unable to use other transportation requires an unimpaired person dispatching the Handivan.

In support of her racial argument, Wilson cites some inappropriate statements Jones

allegedly made outside of Wilson's presence, none of which negate the lawful purpose of the

drug test.  Also, Wilson cites other Secretary I employees in other departments that are white and

not being drug-tested.  Wilson does not understand that those employees are not covered by the

federal regulation that provides funding for the Handivan department.  Each department has its

own rules and regulations, and some are controlled by Union contracts.  Wilson claims she was

singled-out comparing herself to E911 dispatches, but the E911 dispatchers are not safety-

sensitive employees under the FTA because they do not control the movement of a revenue

service vehicle. Ex. C, 74:3-15; Ex. H, 51:6-53:12.  Also, Galesburg's other Secretary Is who

dispatch vehicles only dispatch Public Works vehicles, not revenue service vehicles. Ex. C,

79:17-80:4.  Wilson dispatched revenue generating vehicles governed by a federal regulation that

is not the same as a snow-plow or construction vehicle in other departments.  Wilson is the only

Secretary I in the Handivan department, so her comparison to other secretaries in other

departments is wrong and shows her lack of understanding of why she was tested.

Moreover, Jones testified "My intention was for her to pass, and I didn't want to test her

if she didn't want to be tested."  Ex. C, 25:12-14.  He further admitted to delaying a drug-test for

construction employees (in a previous job) up to a month to enable them to pass.  Ex. C, 25:18-21.  Jones' drug-test was based on compliance with FTA requirements to continue to receive funding for the Handivan department.  Jones followed the FTA's regulations regarding drug-testing dispatchers and asked Wilson if she would take the drug-test.

Jones' application of 49 C.F.R. § 655, *et seq.*, was not arbitrary, but was in keeping with the plain language of the regulation.  In fact, Galesburg should have required Wilson to pass a drug-test before she began dispatching the Handivan when she transferred to the Handivan division.  Jones was only trying to ensure Galesburg's compliance with federal regulations and protect Galesburg's funding.  Galesburg, even absent Jones, still tests Wilson's position for the same reasons Jones was correct in having Wilson's position added to the testing pool in 2014.

Wilson has not been deprived of her constitutional rights.  In addition to consenting to the drug testing (which continues to this day even without Jones), Galesburg's drug testing of Wilson's Handivan dispatch position was justified under federal law.  Jones is entitled to judgment as a matter of law.

III.     JONES IS ENTITLED TO QUALIFIED IMMUNITY.

In evaluating qualified immunity on summary judgment, the court answers the following two questions: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1865-66 (2014); *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013).  "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment."  *Gibbs v.*

*Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009)).

Jones has established that Wilson's constitutional rights were not violated because Wilson consented to the drug test and the drug test was accomplished pursuant to federal law. However, if it is assumed that the drug test was unconstitutional, Jones is still entitled to qualified immunity if the allegedly violated right was not clearly established at the time of the alleged deprivation.

Qualified immunity shields officials from liability in civil suits as long as their actions do not violate "clearly established" statutory or constitutional rights "of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   The court evaluates the "*particular* conduct" of the specific act, not a "broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overruled on other grounds)).

Wilson argues she should not have been tested because she was not performing a safety sensitive function.  However, Jones should be entitled to immunity if Wilson's dispatching falls into a gray area.  If both sides have a different interpretation of the law, and there is no clear precedent, Jones' discretion to test Wilson entitles Jones to immunity.

A right is "clearly established" when "[t]he contours of the right [… are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  In order to defeat the qualified immunity, precedent must "squarely govern[]" the particular conduct.  *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004). A clearly established right must have existing precedent, though not necessarily directly on point, that places the statutory or constitutional question "beyond debate." *Ashcroft*

*v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).  For example, in *Brosseau v. Haugen*, an excessive force case, the officer's actions fell in the "hazy border between excessive and acceptable force[,]" so the qualified immunity applied and defeated the suit against the officer.  543 U.S. 194, 201 (2004) (quoting language from *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).  Moreover, qualified immunity protects all government officials except for the "plainly incompetent" or officials knowingly violating the law.  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

The FTA requires an employee who controls the dispatch of a revenue service vehicle, i.e. a safety-sensitive function, to pass a pre-dispatch drug-test and to enter a random drug-test pool after passing the pre-dispatch test.  49 C.F.R. §§ 655.4, 655.41.  Jones sought to apply that federal regulation to every applicable Galesburg employee in the Handivan department.  Jones has contemporaneous evidence that illustrates he was trying to ensure Galesburg was complying with the law when he had Wilson tested.  Jones has emails documenting his inquiry with Mid-West Truckers.  Ex. F.  Also, Jones has presented an affidavit from the Illinois Depart of Transportation documenting Jones' concerns and research.  Ex. G.  Galesburg's City Manager also confirmed Jones' concerns.  Ex. H, 31:12-32:14.

Wilson's must show the alleged constitutional deprivation was "clearly established" so that a reasonable government official would have understood that the particular conduct violated Wilson's rights.  *Harlow*, 457 U.S. 800, 818 (1982); *Anderson*, 483 U.S. 635, 640 (1987).  If the constitutionality of the particular conduct is unclear, then qualified immunity defeats the claim.  *Brosseau*, 543 U.S. 194, 201 (2004).  Put another way, qualified immunity shields Jones from the claims unless he was "plainly incompetent" or knowingly violated the law.  *Mullenix*, 136 S.Ct. 305, 308 (2015).

No mandatory authority exists clearly establishing Jones' drug-test was illegal. There is no clearly established law that Wilson's dispatching was not a safety-sensitive function. If the Court believes that Wilson's conduct does not fall squarely within the definitions laid out by 49 C.F.R. 655, the Court must balance Wilson's interests against Galesburg's interests, using the four-factor test cited in *Krieg v. Seybold*, 481. F.3d 512 at 518-19 (7th Cir. 2007). The very existence of a four-factor test which federal courts use to weigh whether the government's interest outweighs an employee's intrusion itself is an illustration of the gray area if the FTA's regulation cannot simply be followed. Regardless of how the Court would rule on the factors, since it is not "beyond debate" that the balancing test favors Wilson (and instead favors Jones), Jones has qualified immunity shielding him from Wilson's first claim alleging a Fourth Amendment unreasonable search. *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011).

Wilson also cannot show that Galesburg failed to drug test a white employee situated similarly to Wilson. No other Galesburg Secretary I had dispatch duties for a revenue service vehicle. The E911 dispatchers can only be drug-tested if reasonable suspicion exists. Therefore, Wilson is unable to find a similarly situated white Secretary I performing dispatching services for a revenue service vehicle in Galesburg that Jones refused to drug test.

Since Jones was following FTA's drug-testing requirements, Wilson cannot show she was constitutionally deprived. Additionally, Wilson cannot show her consent to the drug test was not a valid waiver of her Fourth Amendment interests, thus Wilson was not constitutionally deprived. Finally, Wilson cannot show it was clearly established that drug testing Galesburg's Handivan dispatcher violated a clearly established right. Jones is entitled to qualified immunity for his actions taken in furtherance of ensuring Galesburg's compliance with federal law. Jones is entitled to judgment as a matter of law based on qualified immunity.

### Conclusion

Defendant, David W. Jones in his individual capacity, is entitled to summary judgment on all issues and Wilson's Complaint should be dismissed with prejudice.

DAVID W. JONES

By: */s/ James M. Kelly*
James M. Kelly

James M. Kelly
JAMES KELLY LAW FIRM
7817 N. Knoxville Ave.
Peoria, IL 61614
jim@jameskellylawfirm.com
P:  (309) 679-0900
F:  (309) 679-0919